UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-2150

THE JOHN S. BOYD COMPANY, INC., ET AL.,

Plaintiffs, Appellees,

v.

BOSTON GAS COMPANY, ET AL.,

Defendants, Appellees,

NEW ENGLAND ELECTRIC SYSTEM, ET AL.,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Torruella, Cyr and Boudin,

Circuit Judges.

Scott P. Lewis, with whom Palmer & Dodge, and John F.

Sherman III, were on brief for appellants.

Gerald P. Tishler, with whom James W. Stoll, Jonathan J.

Kane, Brown, Rudnick, Freed & Gesmer, Lawrence E. McCormick, and

Wendy B. Levine, were on brief for appellees.

May 26, 1993

TORRUELLA, Circuit Judge. In this appeal we determine

whether appellants must pay the entire cost of cleaning up two

different environmental hazards: coal gas waste and oil gas

waste. As the district court correctly apportioned liability

under the governing principles of the Comprehensive Environmental

Response, Compensation and Liability Act of 1980 ("CERCLA"), 42

U.S.C. 9601 et seq., and the Massachusetts Superfund Act, Mass.

Ann. L. ch. 21E (1993), we affirm.

FACTS

The Lynn Gas Light Co. began manufacturing gas in

Massachusetts in the mid-1800's. The Lynn Electric Light Co., an

electric utility, began operation some thirty years later. These

companies merged in 1888, by legislative decree, to form the Lynn

Gas and Electric Co. That company continued to manufacture gas

from coal ("coal gas") in large quantities until 1951, when

natural gas became available. After that date, Lynn Gas and

Electric Co. and the successor to its gas business manufactured

gas from oil ("oil gas") in small quantities, to supplement the

supply of natural gas during peak periods of use. This

manufacture, called peak shaving, continued until 1972.

New England Electric System ("NEES"), a holding company

owning various utilities and an appellant in this case, bought

about 97% of the Lynn Gas and Electric Company in 1957. In 1959,

NEES created a new company, called the Lynn Gas Co., and

structured a transaction between the new company and the Lynn Gas

and Electric Co. In this transaction, the Lynn Gas Co. acquired

-2-

the gas portion of the Lynn Gas and Electric Co. Lynn Gas and

Electric Co. kept the electric portion and changed its name to

Lynn Electric Co. Lynn Gas Co. became part of NEES' gas

division. In 1962, Lynn Electric merged into the Massachusetts

Electric Company ("Mass. Electric"), a subsidiary of NEES and

also an appellant in this case.

In the 1959 Separation Agreement, Lynn Gas agreed to

assume "all the duties and liabilities of Lynn Gas and Electric

related to such gas business." The Agreement spelled out those

duties and liabilities, but did not mention environmental or

other contingent liabilities. Nonetheless, Lynn Gas Co. agreed

to "indemnify and save harmless Lynn Electric Company from any

duty or liability with respect to the gas business." The

separation of the Lynn Gas Co. from Mass. Electric was not truly

completed by the Agreement. Mass. Electric conveyed much of the

gas-related real estate to Lynn Gas in 1962, more than two years

after the separation occurred, and continued conveying gas-

related parcels of land to Lynn Gas until 1970. Mass. Electric

never transferred other parcels.

In 1964 the SEC ordered NEES to divest itself of its

gas holdings under the Public Utilities Holding Company Act, 15

U.S.C. 79a et seq. The Supreme Court affirmed. SEC v. New

England Electric System, 390 U.S. 207 (1968). NEES finalized the

divestiture in 1973 by selling Lynn Gas and several other gas

companies to Boston Gas, a company unaffiliated with NEES. In

the Purchase Agreement, Boston Gas agreed to assume the

-3-

liabilities of Lynn Gas "as then existing." A similar clause in

the later document entitled Assumption of Liabilities provided

that Boston Gas would assume all liabilities "outstanding at the

date hereof." The Lynn Gas Co. was dissolved in 1980.

Some of the land upon which the Lynn Gas & Electric Co.

and Lynn Gas Co. manufactured gas was taken by eminent domain

from Boston Gas and Mass. Electric in 1981 and sold to outside

buyers. When these buyers discovered that the property was

contaminated by coal gas waste, they sued NEES, NEES

subsidiaries, and Boston Gas under CERCLA and its Massachusetts

parallel.1 During the course of the suit, Boston Gas filed a

claim against NEES because oil gas waste, generated after 1951,

contaminated property it acquired in the Lynn Gas Co. deal.

The case proceeded in two phases. The first phase

resulted in a partial consent decree holding the utilities

jointly and severally liable to plaintiffs for the cleanup. The

second phase concerned liability among the utilities, and is the

subject of this appeal. In the second phase, the court assigned

full liability to Mass. Electric, as the successor of the Lynn

Gas and Electric Co., for the cleanup of coal gas waste on

plaintiffs' property. The court also ordered NEES and its

subsidiary New England Power Service Co. ("NEPSCO")2 to pay for

1 Plaintiffs also raised other claims, but their disposition is
not at issue on appeal.

2 NEPSCO is a service company devoted to providing
administrative, engineering, and other services to NEES
companies.

-4-

the cleanup of oil gas waste on Boston Gas' property. This

appeal followed.

-5-

DISCUSSION

Under CERCLA3, four parties may be responsible for the

costs of an environmental cleanup. These are: the owner or

operator of a contaminated vessel or facility; the owner and

operator of a facility at the time it became contaminated; any

person who arranges for the transport or disposal of hazardous

wastes; and any person who accepts hazardous wastes for the

purposes of transport or disposal. 42 U.S.C. 9607(a). Courts

have interpreted this statute to include successor corporations

in a merger situation, e.g., Anspec Co. v. Johnson Controls,

Inc., 922 F.2d 1240, 1245 (6th Cir. 1991); Louisiana-Pacific

Corp. v. Asarco, Inc., 909 F.2d 1260, 1262-63 (9th Cir. 1990),

and parent corporations when the parent can be considered an

operator, United States v. Kayser-Roth Corp., 910 F.2d 24, 26

(1st Cir. 1990), cert. denied, 111 S. Ct. 957 (1991), or an

owner, United States v. Kayser-Roth Corp., 724 F. Supp. 15, 23

3 Although we primarily discuss CERCLA in the body of the
opinion, we have not overlooked the fact that the Massachusetts
Superfund Act is also a part of this case. CERCLA "is in many
ways analogous to the Massachusetts statute." Acme Laundry Co.

v. Secretary of Environmental Affairs, 410 Mass. 760, 575 N.E.2d

1086, 1092 (1991); see also Dedham Water Co. v. Cumberland Farms

Dairy, Inc., 889 F.2d 1146, 1156 (1st Cir. 1989) (Massachusetts

statute "is patterned after the federal CERCLA statute"). As
such, the Massachusetts courts construe it in line with the
Federal decisions "absent compelling reasons to the contrary or
significant differences in content." Rollins Environmental

Services, Inc. v. Superior Court, 368 Mass. 174, 330 N.E.2d 814,

818 (1975) (discussing rules of procedure). Of course, the
Massachusetts statute differs from CERCLA in some respects. See

Griffith v. New England Telephone & Telegraph Co., 414 Mass. 824,

610 N.E.2d 944 (1993) (defining owner and operator differently
for the purposes of strict liability). We will not discuss
Massachusetts law unless it becomes relevant to the case.

-6-

(D. R.I. 1989).

The list of responsible parties reflects CERCLA's

"essential purpose" of making "those responsible for problems

caused by the disposal of chemical poisons bear the costs and

responsibility for remedying the harmful conditions they

created." Dedham Water Co. v. Cumberland Farms Dairy, Inc., 805

F.2d 1074, 1081 (1st Cir. 1986).4 CERCLA thus makes such

parties liable to the government or to other private parties for

the costs of a cleanup. Id.

If 9607(a) imposes liability on a party, then that

party cannot escape liability by means of a contract with another

party. 42 U.S.C. 9607(e)(1) provides that "[n]o . . .

agreement or conveyance shall be effective to transfer from the

owner or operator of any vessel or facility or from any person

who may be liable for a release or threat of release under this

section, to any other person the liability imposed under this

section." That is, the government or a private party can pursue

any responsible party it desires.

Two or more parties, however, can allocate ultimate

responsibility among themselves by contract. The same statute

states that "[n]othing in this subsection shall bar any agreement

to insure, hold harmless, or indemnify a party to such agreement

4 In Dedham Water, we recognized one other fundamental policy of

CERCLA: "Congress intended that the federal government be
immediately given the tools necessary for a prompt and effective
response to the problems of national magnitude resulting from
hazardous waste disposal." 805 F.2d at 1081. That policy is not
implicated in this appeal.

-7-

for any liability under this section." Id. Such agreements have

been described as "tangential" to the enforcement of CERCLA.

Jones-Hamilton Co. v. Beazer Materials and Services, Inc., 973

F.2d 688, 692 (9th Cir. 1992).

Appellants contend that the district court erred in

imposing the full cost of cleanup in this case on them because,

as companies separate from the Lynn Gas and Electric Co. or the

Lynn Gas Co., they are not responsible parties under CERCLA.

Rather, the district court should have imposed the full cost of

cleanup on appellee Boston Gas. Appellants arrive at this

conclusion in two steps. First, they argue that the Lynn Gas Co.

is the direct successor to the gas portion of the Lynn Gas and

Electric Co., and assumed its coal gas liability. Next,

appellants argue that Boston Gas, as the successor of the Lynn

Gas Co., assumed its coal and oil gas liabilities. We disagree

with appellant on all points.

I.

We first discuss who is responsible for the coal gas

waste created before any of the present parties were involved

with the Lynn Gas and Electric Co. To accept appellant's

conclusion, we must find that the liability shifted from the

independent Lynn Gas and Electric Co., to the NEES-owned Lynn Gas

and Electric Co. (renamed the Lynn Electric Co.), to the Lynn Gas

Co., and finally to Boston Gas. We cannot do so, as the district

court correctly found that the chain of liability for coal gas

waste broke at the link between NEES and the Lynn Gas Co.

-8-

When NEES bought Lynn Gas and Electric Co., it

maintained that company as a separate entity with continuing

liability under CERCLA for the waste it created before 1951. See

42 U.S.C. 9607(a)(1) (owner and operator of a vessel or

facility is a responsible party). When NEES sold the gas portion

of Lynn Gas and Electric Co. to the newly-created Lynn Gas Co.,

the environmental liabilities of Lynn Gas and Electric did not

disappear.

Consistent with CERCLA's policy of holding the company

that sullied the property responsible for the costs of cleanup,

see Dedham Water, supra, those liabilities travelled to the

successor, if any, of Lynn Gas and Electric. See 42 U.S.C.

9607(a)(2) (owner or operator of facility at time of discharge is

a responsible party); Smith Land & Improvement Corp. v. Celotex

Corp., 851 F.2d 86, 91 (3d Cir. 1988), cert. denied, 488 U.S.

1029 (1989).

Initially, Lynn Gas and Electric Co. and Lynn Electric

Co. were the same entities. That fact is reflected not merely

because of a simple name change, but also because the Lynn

Electric Co. kept Lynn Gas and Electric's property. As noted

above, the Lynn Electric Co., which by then merged into Mass.

Electric, conveyed the gas-related property to the Lynn Gas Co.

at various points between 1962 and 1970. By virtue of the

merger, Mass. Electric became the heir to the assets and

liabilities of the Lynn Electric Co. See Smith Land, 851 F.2d at

91 ("In case of merger . . . where one corporation ceases to

-9-

exist and the other corporation continues in existence, the

latter corporation is liable for the debts, contracts and torts

of the former").

The question, then, is whether the Lynn Gas and

Electric Co. transferred to the Lynn Gas Co. ultimate

responsibility for environmental hazards by contract. The

relevant document is the Separation Agreement (the "Agreement")

entered into between the parties on September 9, 1959; a later

indenture also bears on the issue. As neither document

apportions CERCLA liabilities explicitly, we must discern the

intent of the parties. We do this by reference to other cases

dealing with nonexplicit assumptions of liability in order to set

a standard by which to measure that intent.

We note at the outset that the district court was

uncertain whether to use a state rule of contract interpretation

or a uniform federal rule. Indeed, while federal law governs the

validity of liability agreements in the CERCLA context, Mardan

Corp. v. C.G.C. Music, Ltd., 804 F.2d 1454, 1457 (9th Cir. 1986),

courts have wrestled with what the content of that law should be.

The majority of courts have turned to state contract law to

provide the substantive rule, so long as it is not hostile to the

federal interests animating CERCLA. E.g., id.; United States v.

Hardage, 985 F.2d 1427, 1433 (10th Cir. 1993); Jones-Hamilton Co.

v. Beazer Materials & Services, Inc., 973 F.2d 688, 692-93 (9th

Cir. 1992); Olin Corp. v. Consolidated Aluminum Corp, 807 F.

Supp. 1133, 1141 (S.D.N.Y. 1992); Rodenbeck v. Marathon Petroleum

-10-

Co., 742 F. Supp. 1448, 1456-57 (N.D. Ind. 1990). But see Mobay

Corp. v. Allied-Signal, Inc., 761 F. Supp. 345, 352 (D. N.J.

1991); Wiegmann & Rose Int'l Corp. v. NL Industries, 735 F. Supp.

957, 961-62 (N.D. Cal. 1990).

This circuit recently reached the same conclusion in an

analogous situation. American Policyholders Insurance Co. v.

Nyacol Products, Inc., No. 92-1949, slip op. at 16 (1st Cir.

Feb. 24, 1993) (rejecting use of "uniform federal rule of

decision to govern interpretation of an insurance policy's scope

of coverage vis-a-vis CERCLA liability"); see also Robertshaw

Controls Co. v. Watts Regulator Co., 807 F. Supp. 144, 153 (D.

Me. 1992) (applying state rather than federal law to interpret

whether settlement agreement shifted CERCLA liability).

We thus look to Massachusetts law for guidance in

interpreting the Agreement with respect to CERCLA liabilities.

Two principles strike us as particularly relevant. First, "laws

enacted after the execution of an agreement are not commonly

considered to become part of the agreement unless its provisions

clearly establish that the parties intended to incorporate

subsequent enactments into their agreement." Arthur D. Little,

Inc. v. Commissioner of Health and Hospitals, 395 Mass. 535, 481

N.E.2d 441, 452 n.13 (1985) (quoting Feakes v. Bozycako, 373

Mass. 633, 369 N.E.2d 978, 980 (1977)); see also Mayor of Salem

v. Warner-Amex Cable Communications, Inc., 392 Mass. 663, 467

N.E.2d 208, 210 (1984). Second, "a general release . . . is to

be given effect, even if the parties did not have in mind all the

-11-

wrongs which existed at the time of the release," so long as the

language of that release is broad enough to encompass such

contingent liability. Naukeag Inn, Inc. v. Rideout, 351 Mass.

353, 220 N.E.2d 916, 918 (1966).

These principles essentially lead to one rule

applicable to the present case. To transfer CERCLA liability,

the Agreement must contain language broad enough to allow us to

say that the parties intended to transfer either contingent,

environmental liability, or all liability. The Agreement must

recognize the possibility of future liability or dispense Lynn

Gas and Electric of all liabilities in the form of a general

release. Unfortunately for appellants, the language of the

Agreement is not drafted in such broad terms.

While initially the Agreement provides that "Lynn Gas

will assume and take over all the duties and liabilities" related

to the gas business, the Agreement later lists those obligations.

The series contains obligations pertaining only to the existing

business, such as obligations to serve gas customers, honor

contracts for the purchase and sale of new facilities, and

provide reserves to account for bad debt and depreciation on the

gas plant. No reference is made to any future or contingent

liabilities.

An indenture entered into by the parties several months

later contains a similar list. A catch-all provision on

liability refers to the liabilities "indicated in summary form by

the balance sheet" attached to the document, revealing an intent

-12-

that the only liabilities assumed were those known, existing, and

somehow accounted for at the time of execution. It is true that

the indenture states that the liabilities specifically assumed by

Lynn Gas are "without implied limitation." But it is one thing

to say that the list of liabilities is not all-inclusive and

quite another to assume that the obligations not specified

include then non-existent environmental liabilities to be created

under CERCLA and unforeseeable when the agreement was made.

We must conclude that neither document evidences the

intent to transfer environmental liability in the requisite broad

language. The responsible party in this case, as between Mass.

Electric and Boston Gas, is Mass. Electric -- the successor to

the Lynn Gas and Electric Co. See ante at 7-8.

II.

We now discuss who is responsible for the oil gas waste

contaminating the property owned by Boston Gas. To find for

appellants, we must determine that Boston Gas agreed to assume

the environmental liabilities of the oil gas waste produced by

Lynn Gas Co. between 1951 and 1970. Happily, the contract

principles that steered our analysis on the issue of coal gas

waste steer most of our analysis on this issue also. We must

determine whether Boston Gas agreed to assume environmental

liabilities in its agreement to buy Lynn Gas Co.5

5 Technically, NEES sold the Lynn Gas Co. first to Eastern Gas
and Fuel Associates, the parent company of Boston Gas. Eastern
then sold Lynn Gas to Boston Gas on the same day. Because this
intermediate transaction does not alter any liability in this
case by statute, contract, or any other norm, we discuss Eastern

-13-

The contract governing the sale of Lynn Gas to Boston

Gas, the Closing Agreement, provides an easier case than did the

Agreement discussed above. The Closing Agreement expressly

limited the liabilities assumed by Boston Gas to those "as then

existing." A similar clause in the Assumption of Liabilities

document provided that Boston Gas would assume only those

liabilities "outstanding at the date hereof." Such language

fairly obviously forecloses the possibility that Boston Gas

agreed to assume any contingent liabilities, much less the

environmental liabilities at issue here. Nothing in the

remaining documents changes this conclusion.

Apart from the language of the contract, the district

court found several other facts convincing in finding that Boston

Gas lacked the intent to assume the liability here at issue. For

example, the parties did not discuss oil gas waste in their

negotiations. Indeed, it does not appear that Boston Gas was

informed about the oil gas waste at all. Furthermore, there was

no communication between the parties about any contingent

liabilities not appearing on the balance sheet. These facts

bolster our confidence in concluding that Boston Gas did not

accept those liabilities.

Although we are convinced that Boston Gas cannot be

held liable for the oil gas waste, we must determine whether the

district court was correct to impose those liabilities on NEES

and NEPSCO. In other words, are NEES and NEPSCO responsible

no further.

-14-

parties?

In Kayser-Roth, 910 F.2d at 26, we determined that

parent companies can be held liable for CERCLA liability as

operators of a contaminated facility under 42 U.S.C.

9607(a)(2).6 Such liability is direct; it does not require us

to pierce the corporate veil. Id. at 27 ("Kayser is being held

liable for its activities as an operator, not the activities of a

subsidiary"). In contrast, piercing the corporate veil is a form

of owner liability. Kayser Roth, 724 F. Supp. at 23. The

district court determined that Kayser was liable both as an

operator and an owner. Id. at 22-24. When the case came before

our court, we left open the question of owner liability because

our finding on operator liability resolved the issues

satisfactorily. 910 F.2d at 28 n.11.

We envisioned in Kayser that holding a parent liable as

an operator would be somewhat unusual. Id. at 27. "To be an

operator requires more than merely complete ownership and the

concomitant general authority or ability to control that comes

with ownership. At a minimum it requires active involvement in

the activities of the subsidiary." Id. This standard requires

an investigation into the relationship between the parent and

subsidiary, in order to reveal the requisite level of corporate

involvement. As the question is fact-laden, we review the

district court's findings only for clear error. Id.

6 That section holds liable "any person who at the time of
disposal of any hazardous substance owned or operated any
facility at which such hazardous substances were disposed of."

-15-

The relationship among the relevant companies in this

case amply demonstrates that operator liability burdens NEES and

NEPSCO with the responsibility to purge the oil gas waste from

Boston Gas' property. We recite only a few of the facts which

the district court found dispositive, and which we too find

important.

NEES continually maintained a presence among the

officers and directors of Lynn Gas. The president of Lynn Gas

was also the president of NEES' gas division; he was appointed by

the chairman of NEES and reported directly to NEES officials.

NEES selected the directors of Lynn Gas, and a senior officer of

NEES approved Lynn Gas' budget. Lynn Gas needed approval for all

expenditures over $5,000. NEPSCO provided extensive services to

Lynn Gas, such as controlling the checking account, handling the

purchase of the oil used in peak shaving, and maintaining Lynn

Gas property. NEPSCO employees were also well represented among

Lynn's officers and directors.

Given the almost overwhelming evidence, we cannot say

that the district court clearly erred in finding that NEES and

NEPSCO were operators of the Lynn Gas facilities. NEES and

NEPSCO are responsible parties for the oil gas waste created

while they were linked to the Lynn Gas Co.

III.

We must resolve several residual matters, but they need

not detain us long.

Appellants contend that under the principles of

-16-

successor liability, Boston Gas must be liable for the cleanup of

the waste sites. Appellants' argument has initial appeal in that

Boston Gas, and Lynn Gas before it, took over the gas business of

other companies. This argument, however, does not reflect the

successor corporation doctrine. In Dayton v. Peck, Stow and

Wilcox Co., 739 F.2d 690, 692 (1st Cir. 1984), we identified four

situations in which successor liability is appropriate: when the

buyer agrees to assume liability; when a consolidation or de

facto merger occurs; when the buyer is merely a continuation of

the seller; and when the transaction is a fraud to escape

liability.

We have already determined that Boston Gas, and Lynn

Gas before it, did not agree to assume environmental liability.

Furthermore, there is no allegation of fraud in this case. Only

the merger and continuation situations remain to bind Boston Gas

as successor to the gas liabilities in this case. There was, of

course, no formal merger by which Lynn Gas Co. -- and later

Boston Gas -- assumed the liabilities of Lynn Gas and Electric

Co., so appellants would have to prove a de facto merger claim.

Central to a de facto merger or continuation of the seller

corporation claim, however, is a finding that shareholders,

officers and directors continued into the buyer corporation. Id.

at 693. Boston Gas, however, did not share any such continuity.

The successor corporation doctrine actually supports imposing

liability on appellants, as the requisite continuity existed in

their corporate structures.

-17-

Appellants also argue that Mass. Gen. L. ch. 164 98

requires the assumption by Boston Gas of the environmental

liabilities at issue here. That brief statute states that "[t]he

purchasing or consolidated company shall . . . be subject to all

the duties, liabilities and restrictions, of the company selling

or merged as aforesaid, so far as they are applicable to the

purchasing or consolidated company." The district court found

that the statute simply serves to allocate the rights of the

public with respect to the utilities, and does not curtail the

rights of contracting parties to allocate ultimate liability

between themselves.

We find no error in the district court's interpretation

of 98. The documents transferring the gas business to Lynn Gas

Co. and later selling Lynn Gas Co. to Boston Gas both refer to

98. The documents proceed to list the present liabilities owed

by the companies to customers and other members of the public.

The parties thus understood the statute to allocate certain,

existing liabilities only. The liabilities at issue in this case

are not among them.

Finally, appellants argue that equity requires Boston

Gas to share in the cost of the cleanup. We find nothing

inequitable in imposing those costs solely on appellants,

however. The policy underlying CERCLA -- to make those who

befouled the environment responsible for its cleanup -- is

certainly equitable. See Dedham Water, 805 F.2d at 1081. We

have found that appellants were the proper responsible parties in

-18-

this case, and it is equitable for them to clean up the property.

Affirmed.

-19-